IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 22, 2024 Session

## STATE OF TENNESSEE v. VINCENT OLAJUAN MORRISON

**Appeal from the Criminal Court for Knox County**
**No. 120348   G. Scott Green, Judge**

_____

## No. E2023-01546-CCA-R3-CD

_____

The Defendant, Vincent Olajuan Morrison, appeals his convictions for aggravated burglary, employment of a firearm during the commission of a dangerous felony, and especially aggravated robbery, for which he received an effective sentence of thirty years' incarceration.  On appeal, he argues that (1) the evidence adduced at trial was insufficient to support his convictions; (2) the trial court erred by admitting certain statements through the victim's testimony, which violated the rule against hearsay and the Confrontation Clause; (3) the State's cross-examination of a defense witness improperly shifted the burden of proof to the Defendant; (4) the trial court violated the "spirit" of *Batson v. Kentucky*, 476 U.S. 79 (1986), by permitting the Defendant to be tried by an all-white jury; and (5) his sentence is excessive.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which JILL BARTEE AYERS and TOM GREENHOLTZ, JJ., joined.

Dillon E. Zinser (at trial and on appeal); and Dave Williams (at trial), Knoxville, Tennessee, for the appellant, Vincent Olajuan Morrison.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General (at oral argument) and Christian N. Clase, Assistant Attorney General; Charme P. Allen, District Attorney General; and Leland Price and Robert DeBusk, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I.    FACTUAL AND PROCEDURAL HISTORY

Just before 5:00 a.m. on July 18, 2021, Jonathan Carter ("the victim") called 911 to report that he had just been robbed in his apartment by two armed assailants and that he had been beaten during the robbery. The Defendant was later identified as a suspect, and a Knox County grand jury returned an indictment charging him with especially aggravated burglary, employment of a firearm during the commission of a dangerous felony, especially aggravated robbery, and especially aggravated kidnapping. *See* Tenn. Code Ann. §§ 39-13-305, -403, -1004; -17-1324(b)(1). The Defendant's case proceeded to a jury trial on January 10 and 11, 2023.

### A.    Trial

The State first introduced a recording of the victim's 911 calls through the testimony of Michael Mays, a custodian of records for the Knox County Emergency Communications District. During the victim's calls, he said that he heard a knock on his door and that when he opened his door, two African American men wearing dark-colored clothes forced their way into his apartment. One of the men hit the victim with his firearm, causing the victim to fall to the ground. The victim reported that the men had stolen money, a wristwatch, a ring, and a gold chain necklace from his home. He requested that an ambulance be sent, and he called back several times to check on the ambulance's proximity to his home.

Knoxville Police Department ("KPD") Officers Michael Black and Trevor Orr responded to the victim's apartment. Video footage from their body cameras was introduced and played for the jury. The video footage showed that the officers had some difficulty locating the victim's residence upon arriving but ultimately found the victim standing outside his apartment talking on his cell phone. Officer Black noted that the victim's face was bloody. The victim escorted the officers to his apartment, and seemingly disoriented, he sat down on his front porch and detailed the events for Officer Black. At that time, the victim also gave his consent to Officer Orr's request to enter his home.

The victim told Officer Black that he was awakened by a knock at his door. When the victim opened the door, two men forced their way inside his apartment, struck the victim in the face with their firearms, and forced him to the ground. While the victim was on the floor, the two men searched through his apartment and demanded to know where he kept his money. During their search, the men stole a gold ring worth around $500, a gold chain necklace worth around $3,000, and a "gold-plated" watch worth around $60. They also forcibly opened the victim's safe and stole approximately $1,000 in cash. The victim noted that one man was a "big dark guy" who wore no face covering, while the other was "light skinned" and shorter. The victim stated that he believed that the men knew what

they "were coming to get" and that he might have been targeted because he walked around the neighborhood wearing nice clothing.

While the victim gave his statement to Officer Black, Officer Orr entered the victim's apartment and took photographs, which were shown to the jury. Officer Orr testified that he found "blood on the floor" and overturned furniture. The victim's safe, located underneath a desk, was open and appeared to have been looted.

Ultimately, the victim was taken by ambulance to the hospital, where he received treatment for his injuries.

The victim testified at trial that he lived in an apartment in the Five Points neighborhood of Knoxville. The victim operated a small shop from his apartment, selling a variety of goods ranging from candies and sodas to loose cigarettes and pints of liquor. Neighbors interested in buying from him would "come and knock on the door, just open it up," and ask what he had in stock. The victim's customers typically paid in cash, and he kept the proceeds of his sales inside a safe placed underneath a desk. He estimated that he had approximately $1,000 stored in his safe and approximately one "hundred and some dollars in change" elsewhere in his apartment prior to his robbery.

The victim testified that he fell asleep on his couch and was awakened in the early morning hours of July 18, 2021, to the sound of someone knocking at his door and saying, "Unc, Unc, open up." The victim went to his door to look through his peephole and saw a man whom he thought he recognized, so he opened the door. The two men forced their way inside the apartment and began hitting the victim in the head with their firearms. They forced the victim to lie face down on the floor and demanded to know where he kept his money. The victim averred that he had ample opportunity to view his assailant's faces while he lay on the ground and noted that one man was larger than the other. The victim noted that the smaller man initially wore a face covering but removed it once he entered the apartment, while the larger man did not cover his face. He also recalled that the larger man had "platted" or "dreadish" hair.

The two men began to search through the victim's apartment. The victim recalled that the larger man asked him where he kept his money on several occasions and that he tried to respond but "most of the time when [he] said something, [he] got hit." He also stated that he was kicked in the back at some point during the robbery. During their search of the apartment, the two men flipped a chair over, scattered the victim's DVDs along the floor, rifled through his clothing, and "threw [the victim's girlfriend]'s picture down." The victim testified that he believed his assailants "knew what they were going for" and that they had a general idea of where he kept his money but were unable to find it initially because their "description was wrong."

- 3 -

The larger man searched the victim's bedroom and took the victim's ring and "whatever" else he could find therein before returning to the living room, where the victim still lay on his stomach. The larger man demanded the combination to the victim's safe, which was kept under a desk in the victim's bedroom, and the victim responded that the safe did not have a combination, prompting the larger man to hit the victim again. The two men then returned to the victim's bedroom and forced the safe open. After collecting the cash from within the safe, they prepared to leave the apartment. As they were leaving, the larger man paused where the victim lay on the ground and stated, "Oh, my mom said [to] . . . make sure I get this." The larger man then pulled the victim's gold chain necklace from around the victim's neck and delivered a hard blow to the victim's face with his firearm.

The victim remained on the floor briefly after the men left before calling the police. He recalled that he felt lightheaded and dizzy and averred that he did not remember making multiple 911 calls because he was "in survivor mode." He further recalled that he provided details of the encounter to Officer Black that evening and was then taken to the hospital, where he was treated over the course of several days for a "cracked" skull. The victim testified that he felt great pain from his head injuries and suffered ringing ears and headaches behind his eyes. He stated that he still suffered headaches and persistent back pain from his injuries.

The victim testified that he was able to identify his assailants shortly following the incident. While he was recovering in the hospital, he recalled that the smaller, light-skinned man who had called for him to open his door was Dewayne Carter.[1] The victim explained that his girlfriend, Lisa Booker, had previously introduced him to Dewayne as her sister-in-law's son-in-law. He felt shocked and fearful by this recollection because he had considered Dewayne to be "like family." About a week later, after the victim had been released from the hospital, a man whom the victim knew as "Fat Boy" visited the victim's apartment and showed him a photograph of the Defendant taken from Facebook. The victim noted that he had briefly met the Defendant, whom he knew by the nickname "Juan," prior to the robbery. The victim identified the Defendant from this photograph as the larger of his two assailants and promptly called KPD Investigator Brandon Wardlaw to provide the Defendant's name as a suspect. The victim was "positive" that this identification was correct.

The victim also testified that approximately one week before the robbery, Ms. Booker's sister-in-law, Jamesetta "Tabby" Morrison,[2] visited the victim's shop inside his

---

[1] Because the victim and Dewayne Carter share the same surname, we will refer to Dewayne Carter by his first name for clarity. We intend no disrespect.

[2] The other witnesses in this case and the parties in their briefs almost uniformly refer to Jamesetta Morrison as "Tabby" Morrison. Because there is no dispute as to Jamesetta Morrison's identity and because she shares the same surname as Markiya Morrison, we will refer to both of them by their first names for clarity. We intend no disrespect.

apartment. The victim described Tabby as a frequent customer and believed their relationship was "almost like family." On this particular occasion, Tabby and the victim engaged in conversation, during which Tabby began eating peppermints the victim had intended to sell. The victim informed Tabby that she needed to pay for anything she ate from his shop. The victim recalled that Tabby became upset and responded, "You need to be brought down a peg. I'm going to bring you down a peg." Tabby returned to the victim's shop on another occasion several days prior to the robbery, and during this visit, she complimented his gold chain necklace and asked how much it was worth. Sometime after the robbery, the victim learned that Tabby was the Defendant's mother.

On cross-examination, the victim testified that his shop saw approximately ten customers per day and that most of them paid in cash. He stated that he did not immediately provide the names of any suspects to Officers Black and Orr because he did not "know any names" at that point. The victim recalled testifying during the Defendant's preliminary hearing that the money stolen from his safe was closer to $1,500 than $1,000, and he agreed that the smaller figure was likely accurate. He also still believed, as he originally stated to Officers Black and Orr, that he might have been targeted because he walked around the neighborhood wearing nice clothing. Additionally, the victim acknowledged that he was convicted of food stamp fraud and identity theft in 2019.

The State introduced a set of medical records from the University of Tennessee Medical Center regarding the victim's treatment for his injuries following the robbery. The State then rested.

The Defendant elected not to testify but called one witness to present an alibi defense. Markiya Morrison testified that the Defendant was her brother, that Tabby was their mother, and that she and the Defendant had two additional brothers. Markiya testified that during the early morning hours of July 18, 2021, she and the Defendant, along with several other friends and relatives, celebrated a family member's birthday at the Blue Flame nightclub in Atlanta, Georgia. While at the nightclub, Markiya recorded a video and posted it to her Instagram account. This video, time-stamped at 2:27 a.m. on July 18, 2021, was played for the jury. Markiya identified the Defendant in the video and noted that he stood near the "back end" of the nightclub. She further testified that the Defendant wore his hair "flat" at the time and did not have dreadlocks.

On cross-examination, Markiya testified that she had recovered the video showing the Defendant at the Blue Flame nightclub from her Instagram account's archives after learning that the Defendant had been identified as a suspect in the July 18, 2021 robbery. She explained that the video's timestamp was generated by Instagram when the video was posted and did not indicate when the video was recorded. Nevertheless, Markiya maintained that she posted the video to her Instagram account immediately after she recorded it. The Defendant rested.

- 5 -

On this evidence, the jury convicted the Defendant as charged. During the bifurcated proceeding that followed, the State presented a certified copy of the Defendant's prior conviction for delivery of a Schedule II controlled substance, a Class B felony. Thereafter, the jury enhanced the Defendant's conviction for employment of a firearm during the commission of a dangerous felony pursuant to Tennessee Code Annotated section 39-17-1324(h)(2) to a Class C felony.

## B.    Sentencing Hearing

At the Defendant's March 30, 2023 sentencing hearing, the State introduced the Defendant's presentence report, and the Defendant conceded that he qualified as a Range II, multiple offender. Acting as the thirteenth juror, the trial court dismissed the Defendant's especially aggravated kidnapping conviction, concluding that the offense was incidental to the Defendant's commission of especially aggravated robbery. *See State v. White*, 362 S.W.3d 559, 580 (Tenn. 2012) (holding that in trials for charges of kidnapping, the jury must determine "that the victim's removal or confinement was not essentially incidental to the accompanying felony offense"). The trial court also reduced the Defendant's especially aggravated burglary conviction to the lesser included offense of aggravated burglary "pursuant to the terms of the statute." *See* Tenn. Code Ann. § 39-13-1004(d) ("Acts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both."); *see also State v. Tolbert*, 507 S.W.3d 197, 214 (Tenn. Crim. App. 2016) ("[W]hen serious bodily injury to a victim is used to convict a defendant of both especially aggravated burglary and another offense requiring serious bodily injury, the especially aggravated burglary conviction must be reduced to aggravated burglary.").

The State argued that, pursuant to Tennessee Code Annotated section 40-35-114, the trial court should generally consider enhancement factor (1) that the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; and (2) that the defendant was a leader in the commission of an offense involving two or more criminal actors. In support of this argument, the State noted that the Defendant had three prior convictions for delivery of a Schedule II controlled substance and that the victim's testimony indicated that the Defendant "maintained control . . . and interacted with the victim" throughout the robbery. Regarding the Defendant's conviction for aggravated burglary, the State argued that the trial court should further consider enhancement factor (6) that the personal injuries inflicted upon the victim were particularly great, (9) that the defendant possessed or employed a firearm during the commission of the offense, and (10) that the defendant showed no hesitation about committing the crime when the risk to human life was high. *See* Tenn. Code Ann. § 40-35-114. The State noted that the victim was hospitalized for his injuries following the robbery and that the Defendant and Dewayne forced their way into the victim's apartment at gunpoint and commenced the robbery as soon as the victim opened his door.

The Defendant requested that the trial court give little weight to the State's arguments regarding the applicable enhancement factors and noted that his prior convictions were for nonviolent drug offenses. The Defendant presented general mitigating proof, arguing that the victim's testimony identifying the Defendant as the perpetrator of the offenses was unreliable and weak proof. The Defendant further relied upon a letter that he submitted to the trial court and thanked both the trial court for allowing his case to be heard and defense counsel for representing him.

Following these arguments, the trial court sentenced the Defendant as a Range II, multiple offender and concluded that enhancement factors (1) and (2) applied to his convictions for employment of a firearm during the commission of a dangerous felony and especially aggravated robbery. The trial court also applied enhancement factors (6), (9), and (10) to the Defendant's conviction for aggravated burglary, though it noted that it gave little weight to enhancement factor (9) because the Defendant would suffer "a second significant penalty" from his conviction for employment of a firearm during the commission of a dangerous felony. The trial court also noted that it had considered the letter the Defendant submitted.

The trial court imposed sentences of ten years for the Defendant's conviction for aggravated burglary; ten years for his conviction for employment of a firearm during the commission of a dangerous felony, which the trial court aligned to run consecutively to his conviction for aggravated burglary; and thirty years for his conviction for especially aggravated robbery, which it aligned to run concurrently with his other convictions—all resulting in an effective sentence of thirty years' incarceration. The Defendant filed a timely but unsuccessful motion for new trial, and this timely appeal followed.

## II. ANALYSIS

On appeal, the Defendant argues that (1) the evidence adduced at trial was insufficient to support his convictions; (2) the trial court erred in admitting certain statements through the victim's testimony, which violated the rule against hearsay and the Confrontation Clause; (3) the State's cross-examination of a defense witness improperly shifted the burden of proof to the Defendant; (4) the trial court violated the "spirit" of *Batson v. Kentucky*, 476 U.S. 79 (1986), by permitting the Defendant to be tried by an all-white jury; and (5) his sentence is excessive.

### A.    Sufficiency of the Evidence

The Defendant first argues that the evidence adduced at trial was insufficient to establish his identity as a perpetrator of these offenses. The State responds that the evidence was sufficient to support the Defendant's convictions.

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The law provides this deference to the jury's verdict because

> [t]he jury and the [t]rial [j]udge saw the witnesses face to face, heard them testify, and observed their demeanor on the stand, and were in much better position than we are, to determine the weight to be given their testimony. The 'human atmosphere of the trial and the totality of the evidence' before the court below cannot be reproduced in an appellate court, which sees only the written record.

*Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963) (quoting *Folk v. Folk*, 355 S.W.2d 634, 637 (1962)). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

The identity of the perpetrator is an essential element of any crime. *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021) (citations omitted). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995) (citing *White v. State*, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975)). Identity is a question of fact for the jury's determination upon consideration of all competent proof. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). As with any sufficiency analysis, the State is entitled to the strongest legitimate view of the evidence concerning identity contained in the record, as well as all reasonable inferences

which may be drawn from the evidence. *See id.* (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)); *see also Miller*, 638 S.W.3d at 158-59.

In support of his argument that the identification evidence was insufficient, the Defendant makes several claims. First, he challenges the adequacy of the victim's identification of the Defendant made a week following the incident from a Facebook photo that was never shown to the jury. He also notes that the victim was face down during the encounter, providing limited visibility; that there was contradictory testimony about the state of the Defendant's hair on July 18, 2021; that there were at least ten customers in the victim's apartment that day who would have had a similar motive for robbery; and that law enforcement found no direct evidence inside the victim's apartment linking the Defendant to the crime, such as DNA or fingerprints. Regarding his culpability as it relates to his connection to Tabby, the Defendant argues that there was no evidence that Tabby ever directed the Defendant to rob the victim or to take his gold chain necklace and that he had two other brothers who could have committed the crime if Tabby was the one who orchestrated the robbery. He also relies upon Markiya's testimony and the video from her Instagram account as establishing an alibi. Finally, he notes that the victim was convicted of food stamp fraud and identity theft and, thus, unreliable. The Defendant does not otherwise argue that the State failed to prove any essential element of the charged offenses.

In this case, the jury heard evidence that in the early morning hours of July 18, 2021, two armed men robbed the victim in his home and stole approximately $1,000 in cash, a wristwatch, a ring, and a gold chain necklace. The victim recalled that one of these men was larger than the other, had "platted" or "dreadish" hair, and did not wear any facial coverings. The two men forced the victim to the ground and beat him with their firearms. Though the victim remained face down on the ground throughout the robbery, he testified at trial that he had ample opportunity to view his assailants' faces and identified the Defendant as the larger perpetrator who did not wear a facial covering. The victim also testified that approximately one week after the robbery, he was shown a photograph of the Defendant and was then able to identify the Defendant as an assailant because he had previously met the Defendant and knew him as "Juan." This court has observed that "[t]he credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). The State was not required to place the Defendant on the scene through DNA or fingerprint evidence. Moreover, the jury was informed of the victim's criminal past and still chose to accredit his testimony, as was their prerogative.

The victim further testified that the Defendant, before stealing his gold chain necklace, remarked that his mother told him to "make sure [to] get this." The victim recalled interactions with the Defendant's mother Tabby shortly before the robbery, during which Tabby became angry with the victim and showed interest in the necklace. Despite the Defendant's attempts to discredit this connection, the jury was free to make its own

logical inferences from the proof. There is nothing in the record that even suggested one of the Defendant's other siblings was involved in the robbery.

The jury was also presented with evidence of the Defendant's supposed alibi. However, this court has noted that the jury may reject an alibi defense. *State v. Cate*, 746 S.W.2d 727, 729 (Tenn. Crim. App. 1987). "The defense of alibi presents an issue of fact determinable by the jury, as the exclusive judges of the credibility of the witnesses in support of that defense, and of the weight to be given their testimony." *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982) (citing *Green v. State*, 512 S.W.2d 641, 643 (Tenn. Crim. App. 1974)). Though Markiya testified that she immediately posted the video to her Instagram account, she also explained that the video's timestamp was generated by Instagram when the video was posted and did not indicate when the video was recorded. The jury was free to reject the Defendant's alibi. Furthermore, although the victim and Markiya testified differently regarding the Defendant's hairstyle at the time of the robbery, the jury heard both these contradictory statements, as well as the Defendant's and the State's respective attempts to impeach both witnesses.

The sum of the Defendant's arguments are attacks on witness credibility. However, questions of witness credibility and the weight to be accorded to a witness's testimony are left to the jury to resolve, and this court does not disturb those conclusions on appeal. *Bland*, 958 S.W.2d at 659. Because the evidence adduced at trial was sufficient to identify the Defendant as the perpetrator, he is not entitled to relief.

### B.     Tabby's Statements

The Defendant argues that the trial court improperly permitted the victim to testify regarding his conversations with Tabby prior to the robbery as exceptions to the hearsay rule of the declarant's then existing mental, emotional, or physical condition. The Defendant also argues that admitting Tabby's statements through the victim's testimony violated the Confrontation Clause. The State responds that the trial court appropriately concluded that the statements were properly admitted under Tennessee Rule of Evidence 803(3) and that their admission did not violate the Confrontation Clause because they were non-testimonial.

### 1.     Hearsay

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802. However, as relevant here, an otherwise inadmissible hearsay statement may be admissible as "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)[.]" Tenn. R. Evid. 803(3).

Trial courts must conduct layered inquiries when determining the admissibility of evidence objected to on the grounds of hearsay, and our standard of review varies accordingly. *State v. Jones*, 568 S.W.3d 101, 128 (Tenn. 2019). A trial court's factual findings and credibility determinations regarding a ruling on hearsay are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015) (citation omitted). "Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to de novo review." *Id*. (citation omitted).

During the victim's testimony, the trial court held a jury-out hearing to determine the admissibility of the victim's discussions with Tabby prior to the robbery. The State argued that Tabby's statements were admissible under Tennessee Rule of Evidence 803(3)'s exception to the rule against hearsay for statements of the declarant's then existing state of mind because they amounted to a statement of her intent to do "something in the future." The Defendant responded that admitting Tabby's statements could "impose the intent of a separate individual who's not here in court, who's not a witness, onto [the Defendant]." The Defendant also argued that admitting Tabby's statement would violate the Confrontation Clause because she was not present in court and thus not subject to cross-examination.

After considering these arguments, the trial court admitted Tabby's statement that she wanted to take the victim "down a peg" and her expression of her interest in his gold chain necklace. The trial court first noted, "Well I think that the – it's clearly hearsay or based on hearsay to draw the connection between Tabby and [the Defendant]." The trial court then concluded,

> [T]he confrontation itself is admissible. The statement, "I'm going to bring you down, I'm going to take you down," I'm not sure it qualifies under [Tennessee Rule of Evidence] 803, but it seems like it ought to come – once again, it's not an assertion of a then existing fact, which is being offered through a statement. It's a declaration – I think [the prosecutor] is right. I think it's a declaration of intent.

However, the trial court precluded the victim from testifying any further about how he learned that Tabby was the Defendant's mother because that was "clearly based on hearsay." The trial court observed that the familial relationship between the Defendant and Tabby was also likely to be established through the Defendant's witness, the Defendant's sister, Markiya. In denying the Defendant's motion for new trial on the hearsay issue, the trial court explained, "It's circumstantial proof of his identity and quite frankly, I think it was rather significant evidence in this case. They obviously believed [the victim's] testimony, but . . . it was proof as well that circumstantially connected [the Defendant]."

The Defendant in his brief "acknowledges that exceptions to the hearsay rule do apply." We, likewise, upon our de novo review conclude that the trial court properly admitted Tabby's statements under Tennessee Rule of Evidence 803(3). Tabby's statement that the victim needed to be taken "down a peg" was immediately followed by, "I'm going to bring you down a peg," which is plainly a statement of her intent to take future action. Similarly, her statement of interest in the victim's gold chain necklace and inquiry as to its worth, when considered in conjunction with the Defendant's statement that his mother told him to take the necklace, was admissible under Rule 803(3) as a statement of her mental state and was directly probative of whether she issued an instruction to the Defendant, her son, to take the gold chain necklace. *See State v. Trusty*, 326 S.W.3d 582, 603 (Tenn. Crim. App. 2010) ("[I]f a person has a mental state that suggests conduct would be forthcoming because of that mental state, the existence of that mental state can be used as some proof that the conduct occurred.") (citing Neil P. Cohen et al., *Tennessee Law of Evidence*, § 8.08[5][a] (6th ed. 2011)).

The Defendant argues that the State intended to use Tabby's statements to impose onto the Defendant her intent to take the victim "down a peg[.]" The Defendant notes that "there was no proof in the record that Tabby[ ] ever communicated with [the Defendant]." However, the victim had already testified that the larger assailant stated during the robbery that his mother requested he take the gold chain necklace, and the victim had also testified that he had learned Tabby was the Defendant's mother. The State sought to use Tabby's prior statements of aggression and desire for the gold chain necklace to establish both Tabby's future intent and the Defendant's identity as the perpetrator. Moreover, the State was not required to provide the jury with direct proof of any conversation between Tabby and the Defendant because, as discussed above, such was a logical inference from the proof and was only relevant as it related to the sufficiency of the evidence, not to establish an exception to the hearsay rule. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the hearsay statements because there was an applicable exception to the hearsay rule.

Finally, to the extent that the Defendant's argument is based upon the relevance of these statements, he did not raise a relevancy objection at trial, so any such objection on appeal is waived. *See* Tenn. R. Evid. 103(a)(1); Tenn. R. Crim. P. 51(b); *see also State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020) (stating that the party who wishes to raise an issue on appeal first has an obligation to preserve that issue by raising a contemporaneous objection in the trial court). The Defendant is not entitled to relief.

2.      Confrontation Clause

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The right of

confrontation is fundamental and applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965); *State v. Henderson*, 554 S.W.2d 117, 119 (Tenn. 1977). The Tennessee Constitution contains a similar provision stating "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause therefore essentially ensures the right to physically face witnesses and the right to cross-examine witnesses at trial. *State v. Lewis*, 235 S.W.3d 136, 142 (Tenn. 2007) (citation omitted).

The Confrontation Clause governs only testimonial hearsay, and it applies only to testimonial statements offered for the truth of the matter asserted. *State v. Dotson*, 450 S.W.3d 1, 63-64 (Tenn. 2014). Statements are testimonial when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id*. at 64 (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)). The primary purpose is evaluated not from the subjective or actual intent of the persons involved but from the purpose reasonable participants would have had. *Id*. Whether the admission of hearsay statements violated a defendant's confrontation rights is a question of law subject to de novo review. *State v. Davis*, 466 S.W.3d 49, 68 (Tenn. 2015) (citation omitted).

The Defendant contends that Tabby's statements are testimonial because they were made "under circumstances which would lead an objective witness reasonably to believe that the statements would be available for use at a later trial." He observes that the statements were presented through the victim's testimony and that Tabby was not subject to cross-examination. However, the fact that the statements were presented to the jury through the victim's testimony does not, in and of itself, render them legally testimonial. A testimonial statement is typically a "solemn declaration or affirmation made for the purpose of establishing or proving some fact . . . made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004) (quotations omitted). Therefore, "an out-of-court statement is testimonial . . . if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character." *Dotson*, 450 S.W.3d at 69 (quoting *Young v. United States*, 63 A.3d 1033, 1043-44 (D.C. 2013)). When determining a declarant's primary purpose in making a particular statement, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Dotson*, 450 S.W.3d at 64 (quoting *Michigan v. Bryant*, 562 U.S. 344, 360 (2011)).

By contrast, Tabby's statements that she intended to take the victim "down a peg" and that she was interested in his gold chain necklace were informal statements between two private parties, rather than a solemn declaration or a targeted accusation. *Id*. at 69; *Crawford*, 541 U.S. at 51-52; *see also State v. Franklin*, 308 S.W.3d 799, 815 (Tenn. 2010) (questioning whether statements between "two truly private parties" can ever be testimonial). As noted above, the challenged statements were declarations of Tabby's intent to take future action—an action which, a jury could infer, would be illegal—and were not made with the intent of establishing or proving any past event which would later be potentially relevant to a criminal prosecution. *State v. Cannon*, 254 S.W.3d 287, 303 (Tenn. 2008). Under these circumstances, no objective witness could reasonably conclude that these statements were made to be used at a future criminal trial. Because Tabby's statements were nontestimonial, they present no Confrontation Clause issue. The Defendant is not entitled to relief.

### C.  Shifting the Burden on Cross-Examination

The Defendant next argues that the trial court erred by permitting the State to ask Markiya, his alibi witness, on cross-examination why she had not brought additional witnesses with her to testify in support of the Defendant's alibi. The Defendant contends that this line of questioning unconstitutionally shifted the burden of proof to the Defendant. The State responds that its cross-examination did not shift the burden of proof and was tailored to attack the witness's credibility.

The propriety, scope, manner, and control of the cross-examination of witnesses rests within the sound discretion of the trial court. *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (first citing *Coffee v. State*, 216 S.W.2d 702, 703 (1948); and then citing *Davis v. State*, 212 S.W.2d 374, 375 (1948)). Absent a clear abuse of discretion that results in manifest prejudice to the defendant, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984) (citing *Monts v. State*, 379 S.W.2d 34 (1964)).

Prior to trial, the Defendant filed a notice of his intent to rely upon an alibi witness and presented an alibi defense through Markiya's testimony. Tenn. R. Crim. P. 12.1. The defendant who asserts an alibi defense "presents an issue of fact determinable by the jury, as the exclusive judges of the credibility of the witnesses in support of that defense, and of the weight to be given their testimony." *Crawford*, 635 S.W.2d at 705. "It therefore follows that the credibility of an alibi witness can be attacked on cross-examination in the same way as any other witness's testimony." *Id*. at 706; *see also* Tenn. R. Evid. 611(b) ("A witness may be cross-examined on any matter relevant to any issue in the case, including credibility.").

- 14 -

On direct examination, Markiya testified that the Defendant could not have robbed the victim during the early morning hours of July 18, 2021, because he was with her at the Blue Flame nightclub in Atlanta at that time. Through her testimony, the Defendant presented a video, which Markiya testified depicted him standing near the "back end" of the nightclub. The video was time-stamped at 2:27 a.m. on July 18, 2021, and Markiya testified that she recorded it and immediately posted it to her Instagram account.

On cross-examination, the State extensively questioned Markiya regarding the accuracy of her claim that the Defendant was with her at the Blue Flame nightclub on the evening in question and the video's timestamp. During this line of questioning, the State asked Markiya whether any additional witnesses were present to testify to the veracity of the Defendant's alibi defense and, by extension, the veracity of the video's timestamp. The Defendant objected, arguing that the State was "getting into a burden to prove issue," but the trial court overruled the objection and held that it was "fair cross-examination." Markiya then responded that her best friend and her cousin's mother were also present at the Blue Flame nightclub that evening when she recorded the video but that she did not ask them to accompany her to testify because "nobody told [her] that [she] needed to bring anybody with [her] to verify" these details.

The Defendant asserts that this line of questioning impermissibly shifted the burden of proof from the State onto the Defendant. We disagree. The State's purpose in cross-examining Markiya was to assess her credibility and the validity of her claim that the Defendant was with her at the time of the robbery, including attacking the accuracy of the video's timestamp. While prosecutors should be cautious in their questioning of defense witnesses and mindful of any insinuations that the Defendant bears the burden of proving his innocence, we are not convinced that the State crossed the line into impropriety in this case. Our review of the record indicates that the State's purpose in its cross-examination was to attempt to discredit Markiya's testimony that the Defendant was with her at the time of the robbery and that the timestamp on the video she uploaded to her Instagram account was accurate. Testing a witness's credibility and the validity of a witness's claims is "a valid, and indeed the most essential, purpose of cross-examination." *State v. Eddins*, M2006-02315-CCA-R3-CD, 2007 WL 4116490, at *5 (Tenn. Crim. App. Nov. 14, 2007).

In *State v. Higgins*, this court rejected the defendant's claim that the prosecutor's line of questioning on cross-examination regarding whether the defendant had saved his receipt from the club and whether he had contacted his friends or other witnesses to testify that he was not drinking alcohol at the club, improperly shifted the burden of proof. No. W2010-00779-CCA-R3-CD, 2012 WL 1494640, at *4-5 (Tenn. Crim. App. Apr. 30, 2012). In so holding, this court reasoned that a witness may be cross-examined on any matter relevant to an issue in the case, such as witness credibility, and that the defendant testified on direct examination that on the night in question he was not intoxicated and specifically disputed the testimony of the officers regarding his statements and behavior, raising an issue of credibility. *Id.* at *5. This court observed the existence of the potential

witnesses and their ability to testify regarding whether the defendant drank alcohol that night was particularly relevant in light of the defendant's testimony. *Id.* The court also noted that the trial court instructed the jury that the State was required to prove the defendant's guilt, the defendant was not required to prove his innocence, and comments by counsel were not evidence, all of which the jury was presumed to have followed. *Id.*; *see also State v. Newsom*, M2020-00681-CCA-R3-CD, 2021 WL 1753409, *18-19 (Tenn. Crim. App. May 4, 2021) (concluding, upon plain error review, that the State did not unconstitutionally shift the burden of proof to the defendant by asking whether any witnesses would testify in support of his testimony because such questioning was relevant to test the credibility of the defendant's testimony).

We also note that, in this case, the trial court instructed the jury that the State "has the burden of proving the guilt of the defendant beyond a reasonable doubt," that "this burden never shifts to the defendant," and that "the defendant is not required to prove his innocence." The jury is presumed to follow the trial court's instructions in its consideration of the burden of proof. *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). Accordingly, for these reasons, we will not interfere with the trial court's discretion to allow this line of questioning because the credibility of Markiya and her testimony regarding when she recorded the video were relevant to the jury's assessment of the Defendant's alibi. The Defendant is not entitled to relief.

## D. *Batson* Violation

The Defendant argues that the trial court violated the "spirit" of *Batson v. Kentucky* by permitting him to be tried by an all-white jury. He acknowledges that "the record is devoid of any reference to the racial composition of the jury." Nonetheless, he asks this court to grant him relief "in effort to protect his rights and to expand the protection of the law, that the spirit of *Batson* was violated when an all-white jury was empaneled over his trial." The State responds that the Defendant has waived this claim by failing to raise it in a contemporaneous objection and that the Defendant cannot meet the plain error standard.

In *Batson v. Kentucky*, the United States Supreme Court acknowledged that the Equal Protection Clause of the Fourteenth Amendment prohibits the State from excluding potential jurors from the venire solely due to their race. *Batson*, 476 U.S. at 89; *State v. Hugueley*, 185 S.W.3d 356, 368 (Tenn. 2006); *see also Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (holding that the Constitution "forbids striking even a single prospective juror for a discriminatory purpose") (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)). In *Batson*, the Supreme Court established a three-step inquiry that a trial court must undertake to determine whether a juror was improperly challenged on the basis of race. 476 U.S. at 97-98. First, the defendant must establish a prima facie case of purposeful discrimination against a member of the venire. *Id.* at 93-94. Second, if such a prima facie case is made, then the State must provide a race-neutral basis for the exclusion of the juror(s). *Id.* at 97. Finally, if the State provides a race-neutral basis, the trial court

must then determine whether the defendant has established purposeful discrimination.  *Id.* at 98.

The record contains neither a transcript of the jury selection, information regarding the racial composition of the jury or the use of preemptory challenges, nor any indication that the Defendant ever raised a *Batson* claim.  The only reference to these events is a brief statement by defense counsel at the motion for new trial hearing during argument on this issue: "[I]n the entire venire that we have, it was a completely all-white jury, I believe, except for one person.  That person was never even close to being called up."  Given the sparsity of the record as it relates to this issue, a fact acknowledged by the Defendant, we are unable to review this claim for error.  *See* Tenn. R. App. P. 24(b) (imposing upon the appellant the duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"); *see also State v. Brown*, 373 S.W.3d 565, 571 (Tenn. Crim. App. 2011) ("In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence.") (quoting *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)).

Though the Defendant seemingly admits to waiver of this issue, he does not ask this court to engage in plain error review or otherwise argue why he is entitled to plenary review.  His brief also contains no citation to any law which would support the Defendant's request to "expand the protection" of *Batson* under these circumstances, and we are aware of none which would grant the relief sought.  *See* Tenn. R. App. P. 27(a)(7)(A) (requiring the appellant's brief to contain an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied upon); *see also State v. Thompkins*, E2023-00209-CCA-R3-CD, 2023 WL 8112826, at *5 (Tenn. Crim. App. Nov. 21, 2023) ("We will not summon specters of a constitutional violation without proof of a purposeful intent to discriminate."). Defense counsel also conceded at the motion for new trial hearing that "the case law [was] adverse to [the Defendant's] position."  The Defendant's claim is waived.

## E. Length of Sentence

The Defendant next argues that the trial court imposed excessive sentences for his aggravated burglary and especially aggravated robbery convictions and asks this court to impose the minimum sentence for each offense.  The State responds that the trial court did not abuse its discretion.

When an accused challenges the length of a sentence or manner of service, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness.  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying

- 17 -

the *Bise* standard to "questions related to probation or any other alternative sentence"). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). *See Carter*, 254 S.W.3d at 344. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

The Sentencing Reform Act was enacted in order "to promote justice" and "assure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing and providing a fair sense of predictability of the criminal law and its sanctions." Tenn. Code Ann. § 40-35-102. In determining the proper sentence, the trial court must consider: (1) the evidence adduced at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses; (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210(d)-(f); *Carter*, 254 S.W.3d at 342-43. Moreover, misapplication of an enhancement or mitigating factor no longer "invalidate[s] the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Accordingly, this court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence

is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10.

The Defendant limits his arguments regarding the length of his sentence to his convictions of aggravated burglary and especially aggravated robbery. As a Range II multiple offender, the appropriate sentencing range for the Defendant's conviction of aggravated burglary, a Class C felony, was between six and ten years, while the appropriate sentencing range for his conviction of especially aggravated robbery, a Class A felony, was between twenty-five and forty years. *See* Tenn. Code Ann. §§ 39-13-1003, -403; 40-35-112(b)(1), (3). The trial court imposed within-range sentences for both convictions, as the Defendant received a sentence of ten years for his aggravated burglary conviction and of thirty years for his especially aggravated robbery conviction.

The Defendant argues that because the evidence adduced at trial was insufficient to identify him as the perpetrator of these offenses, the trial court should have imposed minimum sentences. This argument is unavailing for several reasons. First, as noted above, identity is an essential element of every crime. *Rice*, 184 S.W.3d at 662. Moreover where the evidence is insufficient to sustain a defendant's conviction, the appropriate remedy on appeal is to reverse and vacate the defendant's conviction, *see* Tennessee Rule of Appellate Procedure 13(e), not to simply reduce the defendant's sentence to the minimum term of service required by statute. Inasmuch as the Defendant argues that the trial court should have afforded greater weight to the "problematic nature" of the victim's identification testimony, we note that while a trial court is required to consider the evidence received at trial and at the sentencing hearing, Tennessee Code Annotated section 40-35-210(b)(1), its decision as to how to weigh such evidence is discretionary, *Bise*, 380 S.W.3d at 706-07. As we have already concluded that the evidence was sufficient to support the Defendant's convictions and because the Defendant does not otherwise raise any impropriety in the trial court's presumptively reasonable exercise of its discretion, he is not entitled to relief on this issue.

### III.   CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE

- 19 -